**Harlan O. CARLSON and Mildred C. Carlson**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

**Joseph N. FUTOWSKY and Jean Futowsky**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

Nos. 13181–13184.

United States Court of Appeals Seventh Circuit.

March 20, 1961.

———◆———

Maurice Weinstein, Milwaukee, Wis., for petitioners.

Lee A. Jackson, Chief, Appellate Section, Burt J. Abrams, Atty., U. S. Dept. of Justice, Washington, D. C., Abbott M. Sellers, Acting Asst. Atty. Gen., Robert N. Anderson, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, DUFFY and SCHNACKENBERG, Circuit Judges.

HASTINGS, Chief Judge.

We are asked to review the decisions of the Tax Court of the United States entered on May 9, 1960 in Docket Nos. 65856, 65857, 70624 and 70625.

These petitions for review raise the question whether there is substantial evidence to support the determination of the Tax Court that certain property sold by taxpayers-petitioners was held for sale in the ordinary course of business so that the receipts from the sales are taxable as ordinary income rather than capital gains. Section 117(a) (1) (A), Internal Revenue Code of 1939, 26 U.S. C.A.; Section 1221(1), Internal Revenue Code of 1954, 26 U.S.C.A.

The tax years involved were 1953, 1954, and 1955. The Tax Court issued four decisions: one finding deficiencies for 1953 and 1954 against joint taxpayers Harlan O. Carlson and his wife, Mildred C. Carlson; one against the same parties for 1955; one finding deficiencies for 1953 and 1954 against joint taxpayers Joseph N. Futowsky and his wife, Jean Futowsky; and finally, a decision against these latter parties for 1955.

Petitions for review were taken to this court from each decision, and the four petitions were consolidated in the case before us. Mildred Carlson and Jean Futowsky are parties solely because joint returns were filed; herein, the term "taxpayers" will refer only to their husbands, Harlan O. Carlson and Joseph N. Futowsky.

In 1948, taxpayers organized Harjo Corporation to construct and sell homes. Each taxpayer, with his respective spouse, owned a one-half interest in that corporation. Carlson, an electrical engineer, supervised all building operations while Futowsky, an attorney, handled the administration of the business, including financing, selling and subcontracting. Since 1948, Futowsky has held a real estate broker's license. Also, he devoted about five percent of his time to the active practice of law.

From 1948 through 1958, Harjo Corporation constructed 324 homes which were sold for a total sales price of $4,772,-994.98. Of these homes, 129 were sold for $1,920,121.99 during the taxable years in issue. The corporation also bought and sold other real estate during this period.

From 1952 through 1954, taxpayers together also owned a fifty percent interest in Harjo Realty Company, Inc., a corporation which they organized with another individual as a real estate brokerage firm, primarily to handle the sales of homes constructed by Harjo Corporation.

In April, 1950, taxpayers formed a partnership in which each held a fifty percent interest. Partnership returns were filed on a fiscal year basis for the years ending March 31, 1953, 1954 and 1955. During its existence, the partnership acquired and sold seven parcels of property, four of which are the subject of the instant controversy.

Of the seven properties, the first was a rooming house consisting of about thirty rental units which was purchased on April 12, 1950 and sold in January, 1953. The rooming house was completed and was almost entirely occupied by tenants when purchased. This property was operated by a resident manager. The Tax Court stated that taxpayers' activities in relation to this property "were characteristic of one's dealing with investment property." The Commissioner admitted that this property was held by the partnership for investment purposes, and the gain realized on its sale was entitled to long term capital gains treatment. There is no dispute about this transaction.

The remaining six properties were unimproved lots which taxpayers purchased in 1952. One lot was sold to a controlled corporation which in turn constructed an apartment building on the land. Taxpayers subsequently sold their stock in the corporation for a gain. The gain on this sale was taxed as ordinary income realized upon the sale of stock in a collapsible corporation. This transaction is not in dispute.

The partnership itself commenced and completed construction of an eight-family apartment building on each of the re-

maining five lots. The following chart describes the relevant information concerning the purchase, the construction and the sale of these lots:

| Location | Date Purchased | Construction Completed | Date Sold | Cost Basis | Sales Price | Gain |
|---|---|---|---|---|---|---|
| **Fiscal Year Ending March 31, 1953** | | | | | | |
| 4275 N. 27th St. | 3/28/52 | 7/20/52 | 2/26/53 | $45,957.85 | $63,826.60 | $17,868.75 |
| 1981 W. Villard Ave. | 9/ 4/52 | 1/ 1/53 | 2/26/53 | 50,406.25 | 63,630.23 | 13,223.98 |
| **Fiscal Year Ending March 31, 1954** | | | | | | |
| 1111 W. Atkinson Ave. | *4/28/52 | 10/ 1/52 | 8/31/53 | 47,506.11 | **62,511.67 | 13,335.46 |
| 3824 N. 20th St. | 6/18/52 | 11/ 5/52 | 6/ 1/53 | 48,831.75 | ***63,239.81 | 12,908.06 |
| **Fiscal Year Ending March 31, 1955** | | | | | | |
| 1969 W. Villard Ave. | 9/ 4/52 | 2/28/53 | 4/30/54 | 47,918.90 | 57,013.90 | 9,094.42 |

* or 5/26/52.
** Sales Expense—$1,670.10.
*** Sales Expense—$1,500.

A short term capital gain on the sale of the property at 1981 W. Villard Avenue was reported as ordinary income and is not in dispute. Taxpayers reported the $53,206.69 gain on the remaining four properties as long term capital gain. The Tax Court found that these four properties were held for sale in the or-

dinary course of business and that the gain was taxable as ordinary income. These four transactions are before us in this review.

Taxpayers testified that their purpose in buying the lots and improving them was to acquire investment property. The sale of the improved properties in 1953 was attributed to the fact that Futowsky became ill in late 1952 and was unable to continue his personal management of the properties.

The Tax Court considered but did not credit the testimony of taxpayers. It stated that taxpayers' explanation for the sales was "indefinite as to time and details and is uncorroborated by other evidence." Further, there was "no medical evidence concerning [Futowsky's] illness, when it occurred, how it incapacitated him, or how long it lasted."

The decision of the Tax Court reveals a number of the facts upon which it relied. Within a relatively short time after completion of construction, the properties were aggressively advertised for sale more or less continuously until sold. See, Bistline v. United States, 1958, 9 Cir., 260 F.2d 77, 79. The properties were turned over for sale to Harjo Realty Co., and the sales procedure was generally the same as the selling activity in connection with the Harjo Corporation houses. After completion of the apartments and after notice of Futowsky's illness, taxpayers made no attempt to secure outside management for the properties.

The taxpayers' returns for the years 1952–1954 indicate that the partners were withdrawing from the partnership the gain on the sale of real estate each year and that such gain exceeded the gross rental income each year. The apartment projects were "sizable." Four of the six properties acquired in 1952 were held for slightly more than six months after construction was completed. A fifth property was sold unimproved to a collapsible corporation.

■ As a number of our recent decisions have pointed out, each case of this sort must be judged on the basis of its facts. No single criterion is controlling.

This court has indicated that factors which have been considered include "the purposes for which the property was acquired or held; improvements; frequency, number and continuity of sales; extent and substantiality of transaction; nature and extent of taxpayer's business, advertising or listing." Sovereign v. C. I. R., 7 Cir., 1960, 281 F.2d 830, 833. See, in addition, Patrick v. C. I. R., 7 Cir., 1960, 275 F.2d 437, 439; Frankenstein v. C. I. R., 1959, 7 Cir., 272 F.2d 135, 137.

■ The Tax Court properly considered a number of these factors in concluding that at the time of sale of the properties in question taxpayers were in the business of developing and selling apartment buildings. It heard the explanation of taxpayers that Futowsky's illness forced the sales, but the Tax Court did not credit such explanation. It was the proper function of the Tax Court to weigh the evidence, to draw inferences therefrom and to declare the result. Helvering v. Nat. Grocery Co., 1938, 304 U.S. 282, 294–295, 58 S.Ct. 932, 82 L.Ed. 1346; Friend v. Commissioner of Internal Revenue, 10 Cir., 1952, 198 F.2d 285, 287, 46 A.L.R.2d 761.

In cases similar to those presented by the instant petitions, the Supreme Court has cast into proper perspective the scope of our appellate review:

"The Tax Court has the primary function of finding the facts in tax disputes, weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which it considers most reasonable. The Circuit Courts of Appeal have no power to change or add to those findings of fact or to reweigh the evidence. And when the Tax Court's factual inferences and conclusions are determinative of compliance with statutory requirements, the appellate courts are limited to a determination of whether they have any substantial basis in the evidence. The judicial .

eye must not in the first instance rove about searching for evidence to support other conflicting inferences and conclusions which the judges or the litigants may consider more reasonable or desirable. It must be cast directly and primarily upon the evidence in support of those made by the Tax Court. If a substantial basis is lacking the appellate court may then indulge in making its own inferences and conclusions or it may remand the case to the Tax Court for further appropriate proceedings. But if such a basis is present the process of judicial review is at an end. [citations]." Comm'r v. Scottish American Inv. Co., 1944, 323 U.S. 119, 123–124, 65 S.Ct. 169, 171, 89 L.Ed. 113.

We hold that there is substantial evidence in the record to support the inferences drawn therefrom by the Tax Court and that it did not err in its conclusions based thereon.

The decisions of the Tax Court under review are

Affirmed.